Dr. McCain swore that he examined the wounds of the deceased on Tuesday. His skull was broken behind — shattered for some inches, by a blow that must have produced instant death. There were some small contusions on the face which had the appearance, from the crisped flesh, of having been done by a hot instrument. The wound on the back-part of the head seemed to have been made by a heavy, blunt instrument. The homicide occurred on the 25th of December, 1853.
Dr. Scales swore about the same.
Jesse F. Slade swore, that he was sent for to prisoner's house on Monday 26th of December, 1853; that he found the deceased on the floor, with the prisoner's coat under his head. *Page 267 
He examined the back of the head, and found the skull greatly shattered, the skin on the face apparently burnt, and the hair singed. The prisoner's account was, that the deceased had got up and gone out of the house, and directly came back and said that somebody had killed him; that he caught prisoner in his arms and instantly died, adding, "and here he is as dead as hell." The prisoner also said, that if he had killed him, he would have taken him off and covered him up in the leaves where the hogs could have eaten him up. The prisoner was under the influence of spirits, but not drunk. The witness examined, both in doors and out, for blood and marks of violence, but found none. The only blood seen, was where the deceased was lying on the floor. He found a heavy iron shovel in the house, and, in the opinion of the witness, the edge corresponded with the wound on the deceased. The prisoner, when charged with the killing, denied it, and bristled up for a fight.
David Wilson swore that he went to the prisoner's house on Sunday 25th December, 1853, about 12 o'clock; that no one was there but the prisoner; that the prisoner was drinking some; that after a time the deceased came, as he said, to buy some corn; that the deceased and the prisoner drank, and continued to drink until the former got very drunk, and lay down on the floor; that the prisoner was not drunk, but was perfectly rational. He stated that, late in the evening, Joseph Allen came, who staid some minutes, and left. The witness also left, some minutes thereafter. Before leaving, at the suggestion of Allen, the prisoner and witness put the deceased in bed. The witness said he left no one there but prisoner and deceased. He went to Mrs. Smithy's, about three hundred yard's from the prisoner's house. About one hour in the night he heard a noise at the prisoner's, and heard the deceased saying "O Lordy!" and the prisoner saying, "God damn you, if you don't shut your mouth I will kill you." The noise then ceased, and in a few minutes he heard prisoner calling to the witness to come there. The witness said he went, and found the prisoner with his sleeves rolled up, and *Page 268 
coat off, and the shovel in his hands. Prisoner said to him, "Here is Diamond dead as hell and I have killed him." Witness went out and brought in some wood, when the prisoner struck at him, and said he thought it was a dog. He gave the wood to prisoner, and while he was putting it on, witness felt the pulse of the deceased. He also raised the head and saw a stream of blood on the floor, as long as his arm. There was nothing under the head of the deceased. Witness said he was frightened, and left the house suddenly. No one was there but the prisoner and the deceased. The prisoner was then under the influence of spirits, but was rational. Next morning, in company with others, witness went to the prisoner's house, and found him still under the influence of spirits; heard the prisoner say, "there was his good coat under his head, and he would not give it for the damned man."
Joseph Allen swore that he was at the prisoner's house on Sunday evening; found David Wilson, the prisoner, and the deceased there; the latter was drunk on the floor, and the prisoner drinking, but not drunk; witness told them to take the deceased up and put him to bed, which they did; he did not recollect who did it. He staid but a short time there, and left about three-fourths of an hour by sum. Witness was sent for next morning, and went to the prisoner's house. Prisoner said to him, "Here is Dimond dead as hell, but I did not kill him." Witness asked him who did, to which he replied, "he killed his own self." He, prisoner, said to the witness, that the deceased went out of the house, was gone a short time, and returned crawling; that he caught him (prisoner) by the arms and said somebody had killed him, and fell instantly dead. Prisoner further said, that he "wished Dimond had broke his damned body before coming there." Prisoner was under the influence of spirits, but was rational. Prisoner further said that "he had sat up with the deceased until the candle went out, when he went to bed; and that if his friends did not come and take him away he would throw him to the hogs;" that "there was his best coat under his head which he would not give for Dimond." Witness further stated, that the coat which the *Page 269 
prisoner was wearing on Sunday was under the head of the deceased, who then had on another coat. He then looked for blood but found none, except where the deceased was lying, which had run some six inches. He saw the shovel which was large and heavy. He examined the wound, and found the face as if it had been struck with a hot instrument. The back of the skull was broken, and witness believed it had been done with the shovel. He found a horse of the prisoner hitched near the house, some six yards off, which horse was a very vicious one. Witness had never seen the prisoner and deceased together before, and did not know that they were acquainted. The character of the prisoner, when sober, was peaceable; but when drunk he was a violent and outrageous man, and would as soon strike a friend as a foe; there was no doing any thing with him; he seemed frantic; but never had seen him when he did not know right from wrong.
Mrs. Smithy swore that she lived some 200 yards from the prisoner; that on the evening of the homicide, about an hour after dark, she was sick in bed in a back room; that she heard a "lumbering" up at the prisoner's house; she did not know what it was, but heard the prisoner once saying, "if you don't shut your mouth I will kill you;" the noise ceased after a little, and in a few minutes she heard the prisoner calling David Wilson to come there, who went and returned in a few minutes. She also stated she saw the prisoner on Sunday morning and he was drinking. She said the "lumbering was something like chairs."
Joseph Smithy swore that he was at Mrs. Smithy's on the evening of the homicide; that about an hour in the night he heard a voice up at the prisoner's house, and then the voice of the deceased saying "O Lordy!" He also heard the voice of the prisoner saying "if you don't shut your mouth I will kill you." The voice ceased, and the prisoner then called David Wilson to come there. He thought Mrs. Smithy's was a quarter of a mile from the prisoner's house.
Edward R. Windsor testified that he was at the prisoner's house next morning after the homicide; heard the prisoner *Page 270 
say "I wish I had broke your damned body instead of your head," or "I wish your damned body had been broke instead of your head, before you came here;" he did not remember which. Prisoner said "as deceased started out of the house he fell, and then fell against the house two or three times, then came in and said somebody had struck him, seized the prisoner and said he was a dead man; and that if his friends did not take him away he would throw him to the damned hogs; he would not give his coat for the damned man."
Zachariah Groom swore that he heard prisoner say on the morning after the homicide, "I wish I had broke his damned body instead of his head;" that he first said "he wished whoever had killed him had broke his damned body instead of his head."
It further appeared that the prisoner continued drinking on Monday, and became more and more intoxicated during the day.
Upon this evidence, the counsel for the prisoner moved the Court to charge the jury, that if the prisoner were under the influence of spirits, so as to have been frantic at the time of the homicide, the jury ought to acquit. The Court declined so to charge, and told the jury that his drunkenness would not excuse; that if he knew right from wrong, he was responsible. Defendant excepted.
The prisoner's counsel insisted that it was a case of manslaughter, and that his intoxication ought to be taken into consideration upon the question of malice, and moved the Court so to charge.
The Court charged that upon a question between murder and manslaughter, the jury had a right to take into consideration the intoxication of the prisoner to repel malice.
The counsel also moved the Court to charge the jury, that if there was any doubt whether the offense was murder or manslaughter, they ought to find him guilty of manslaughter.
The Court, in the course of the charge, explained the difference between murder and manslaughter, and then said to the jury, that where a homicide was committed, every matter of *Page 271 
excuse, mitigation, or justification, ought to be shown by the prisoner.
The Court called the attention of the jury to the evidence, and asked them, with emphasis, what evidence was there, to reduce the offense to manslaughter. And in relation to the testimony of Mrs. Smithy, the Court said, "that while they had no right to guess the prisoner into conviction, neither had they the right to guess him into an acquittal." Defendant excepted.
The Court omitted, by oversight, to charge the jury that they ought not to convict the prisoner, unless satisfied of his guilt beyond a reasonable doubt. The prosecuting officer, in the course of his argument, told the jury that such was the law. The counsel for the prisoner so argued before the jury, and made it a point upon a motion for a new trial, that they moved the Court so to charge. The Court had not, nor has it now, any recollection that there was a motion for it so to charge. The trial was a long one, and lasted until some time in the night. Defendant excepted for this refusal or omission.
The verdict was, that the prisoner was guilty of murder. Judgment and appeal.
The bill of exceptions filed by the prisoner, presents only one question upon which there can be the slightest doubt. If counsel pray an instruction, in a voice so low, or under such circumstances, that the presiding Judge does not hear it, his omission to give it cannot be regarded as a neglect or refusal; and unless the jury were misled by the bare omission, it is not error. In this case the prisoner could not be prejudiced by it, because the rule, that the jury must be satisfied beyond a reasonable doubt, of his guilt, before they can find him guilty, was expressly stated by his counsel, and admitted by the solicitor for the State. Moreover, it could apply only to the fact of the homicide; for if the jury found that against the prisoner, the Judge very properly said "that every matter of excuse, mitigation, or justification, ought to be shown by him." The burden of proof in such case, being shifted from the State to the prisoner, it was incumbent upon him to establish the matter of excuse or mitigation beyond a reasonable doubt.
There is but a single question, then, presented for our decision, and that is, whether there was any testimony which the Judge ought to have submitted to the jury as tending to prove a mitigation in the character of the homicide, and thus reduce it from murder to manslaughter. In assuming that to be the sole question, we had taken for granted what the Attorney General has, with a proper degree of candor, conceded, that the emphatic manner in which the Judge asked the jury, "what evidence there was to reduce the offence to manslaughter?" was equivalent to telling them that there was no such evidence. See McRae v. Lilly, 1 Ire. 118. State v.Noblett, 2 Jones' Rep. 418. If there were no evidence upon the point in dispute, then it was the duty of the Judge so to declare *Page 274 
but if otherwise, then, we admit that he ought to have submitted it to the jury, without intimating to them an opinion upon its sufficiency or its weight.
In examining this question, we must constantly bear in mind that it assumes the killing of the deceased by the prisoner as an established fact, and that he must show us the testimony which mitigates his offence. This his counsel contends that he has done by the testimony, which proves that on the evening when the transaction occurred, the parties were on friendly terms; that no express malice was shown; that Mrs. Smithy heard a "lumbering at prisoner's house, something like chairs;" that the distance between Mrs. Smithy's house and the prisoner's was too great to enable the witnesses to distinguish the voice of the deceased from that of the prisoner; and that all these circumstances had a tendency to prove that there was a mutual combat, or scuffle, between the parties. It is said also, as a confirmation of this view, that, from the appearance of the bruises and wounds on the deceased, and from the fact that no blood was found on the bed, or anywhere else, except on the floor where the deceased lay, he must have got out of the bed, and been standing on the floor when he received the mortal blow on the back of his head. In considering whether these circumstances ought to be allowed to have the effect contended for, we must collate them with the other circumstances which formed a part of the same transaction, and judge of the whole together. From the testimony of Wilson and Allen, it appears that, late in the afternoon of the day when the homicide was committed, the prisoner and the deceased drank spirits together, until the latter became so drunk that it was thought proper to put him on the prisoner's bed; that about an hour after dark, the "lumbering, as of chairs," spoken of by Mrs. Smithy, or the "noise," as it was called by the witnesses Wilson and Joseph Smithy, was heard up at the prisoner's house, and then these witnesses heard the voice of the deceased crying out, "O Lordy!" and that of the prisoner saying, "if you don't shut your mouth I will kill you;" that Wilson, upon hearing his name called by the prisoner, *Page 275 
went up to his house and found him with his coat off, his sleeves rolled up, and the shovel in his hand, and he then said, "here is Dimond dead as hell, and I have killed him." The next day, however, he denied that he had killed the deceased, and alleged that the deceased had killed himself, or that some person out of doors had killed him; but he did not on the night of the homicide, or at any other time, pretend that the deceased had made an attack upon him, or that he had got into a fight, or even scuffle, with him. He had no would of any kind upon him, and there was nothing in the appearance of his clothes, or of the room, to indicate that there had been a mutual combat. Whatever appearance there was of wounds or bruises, was upon the deceased alone. What ever indications there were of violence, from the outcries of the parties, were that the deceased was a sufferer, and the prisoner was beating him. Under these circumstances, could the prisoner ask that the Court should leave it to the jury to infer a mutual combat between him and the deceased, from the single fact that a noise was heard in his house? In deciding whether there be any evidence to be submitted to a jury, the Judge must necessarily be governed by the impression which the alleged testimony makes upon his mind. The question is admitted to be oftentimes a very difficult one, but he must decide it as he does every other question which the law makes it his duty to decide, according to the honest convictions of his understanding. He cannot shrink from his duty and throw the responsibility upon the jury, by allowing them to conjecture the existence of a fact where there is no testimony tending to establish it. The same duty will, upon an appeal in such case, devolve upon the Judges of the appellate tribunal, and they must decide in like manner, upon the honest convictions of their understanding. With an earnest desire to decide correctly, we have come to the conclusion, that the prisoner has not shown us any evidence of a mutual combat between him and the deceased, and that his Honor who presided at the trial, committed no error in so instructing the jury.
This opinion must be certified to the Superior Court, to the *Page 276 
end that the sentence of the law may be pronounced upon the prisoner.